Stokes v. O'Fallon, &c.

(32)  STOKES v. O'FALLON, EXECUTOR, AND STOKES.

1. A testator dying, and leaving a widow, of whom no mention is made in the will—held, as to the widow to have died intestate.
2. The widows of alien residents, who die in this State, are entitled to dower.
3. The debts of the deceased must be first paid, before the allotment of dower.
4. The personal estate of the deceased, is the primary fund for the payment of his debts.

APPEAL from St. Louis Circuit Court.

M'GIRK, C. J., delivered the opinion of the Court.

This was a bill in Chancery for dower, for a discovery, and for marshalling assets, &c.

The record shows, that the complainant was the lawful wife of William Stokes, who was an alien. That in 1818, Stokes took the preparatory steps towards naturalization. That in 1823, Stokes died, possessed of considerable real and personal estate. That before his death, he made his last will and testament, devising and bequeathing his whole estate, real and personal, to O'Fallon in trust, for the benefit of Ann Stokes, his illegitimate daughter. That Stokes left no lawful issue. That the personal estate is absorbed in the payment of debts, and the principal part of the real estate also. It also appears that the complainant, at the time of Stokes' death, was an alien.

The complainant claims, first, to be endowed of one half of the personal estate of which the testator was owner at the time of his death—before payment of debts ; and that inasmuch as this fund has been used up in the payment of debts, that the remaining lands may be charged with that half, and sold or applied to raise an equivalent, to the use of the widow absolutely.

The answer admits the chief things charged in the bill, and denies the right of the complainant to have any share of the personal property, in exclusion to the payment of debts out of that fund ; and insists that an alien wife is not entitled to be endowed. The Circuit Court, on this state of things, dismissed the complainant's bill, with costs.

Stokes *v.* O'Fallon, &c.

The error assigned, embraces the whole matter on the record. I will first consider the question:—whether, by the laws of this State, as they stood at the time of Stokes' death, in September, 1823, an alien widow could be endowed? And then I will consider the question:—whether a widow's share of the personality, where the estate is solvent, is to be deducted from the whole assets as they stood at the time of the death (33) of an intestate? or whether that share shall be deducted from the remaining assets after the payment of debts?

In this case, before I proceed to the main question, I will notice the fact, that in the will, Stokes is silent as to the widow, which silence by the act of the Legislature of 1st December, 1821, concerning wills and testaments, according to my reading of the 4th section of that act, declares, that when any person shall make a will, and die, leaving a widow, &c., making no mention, in the will, of the widow; that as to her, he shall be deemed to die intestate. So that so far as respects this widow's right to be endowed, I will consider it as a case of intestacy.

I will consider the question whether an alien widow can be endowed. By the act of 6th December, 1820; aliens residing in any part of the U. S. or Territories, who shall have made a declaration of their intention of becoming citizens of the U. S., by taking the necessary oath in due form of law, are declared capable of acquiring and holding real estate in the same manner, and to the same extent, that citizens of the U. S., can do. This act establishes the capacity of the complainant's husband to hold a thing out of which a citizen's widow would be endowed.

I think it is clear from a review of the several acts of the Legislature, passed at different periods of time, that the Legislature never intended to exclude alien widows from dower; it is true, that by the common law, an alien could not be endowed, and the reason given for it, is, because an alien could not hold land. The act passed 19th January, 1816, says, the common law of England, which is of a general nature, and not contrary to the laws of this Territory, shall be the rule of decision—so that there can be no doubt that at common law, the alien widow could not be endowed, unless that part of it which prohibits it was contrary to the then laws of Missouri.

The most recent act in force, on the subject of descents of real estate, at the time of Stokes' death, is, the act to direct descents and distributions, passed 11th January, 1822; which says, that henceforth, when any person, having title to real estate, shall die intestate, his estate shall descend and be distributed, after the payment of debts, in a certain manner, deducting the widow's right of dower, if there be one. This saving, in the act, does no more than save the widow's dower from descending to the heir, which it otherwise would have done, but the saving is a general one, and it (34) seems to me, if the Legislature did not intend all widows to have dower, whether aliens or not, this was a most proper occasion for them to have said so; for, in this case, the whole subject of descents was before them. The expressions, "deducting the widow's right of dower, if there be one," without taking notice of the fact, that there will often, in such cases, be alien widows, is strong evidence they did not intend to exclude them. The next act to be noticed, is that of 25th Jan., 1817, which says, that the estates of persons dying intestate, shall descend and be distributed in the following manner, to wit:—If the intestate shall leave a widow and a child or children, the dower of such widow shall be one-third, &c., and then in the same section, the act says, and any person dying intestate, leaving a widow and no lawful issue, the widow shall be entitled, as her dower, to one equal half of the estate of which her husband died seized, after his just debts are paid, the personal pro-

perty absolutely, and half the lands and slaves, for her life ; upon this act, it is con-
ceived, the widow's right to dower mainly depends; and this is the law the Legisla-
ture had their eye on, in the act of descents, of 1822, wherein they save the widow's
dower from the operation of that act by an express saving.

Upon this view of the several laws, I will remark, that when this act, 1817, was
passed, the law makers must have known that the common law was adopted, and that
by it, all widows could not be endowed: yet they use general words, clearly includ-
ing all widows, as well aliens as others.　This general act is subsequent to the intro-
duction of the common law, and is broad enough to suppress the common law rule.
If alien widows are to be excluded from the benefit of the general words so as to be
excluded from dower, under the common law rule, it should only take place to an-
swer some great end of State or national policy.　I think neither reason nor State
policy requires these general words to be narrowed.　The state policy of England in
refusing aliens to hold land, never did exist in the United States, nor did it ever exist
here ; at the very time this act of 1817 passed, it could not have been a fact unknown
to the Legislature, that there were in the country many alien wives; and I cannot
suppose they had any narrowness of feeling on the subject.　Furthermore, before
the act of 1817, the act of 1815 contained, with respect to dower, about the same ex-
pressions ; so that I think I may safely say, before the common law rule came here,
aliens might have dower, and if this be true, then it must be clear that the statute
(35) law was not impaired by the introduction of the common law.　For the intro-
ducing act introduces no new rules of common law, contrary to the laws of the
country.　At the time this dower was cast, aliens might hold lands by the express
terms of the statute of 1822 ; this woman, however, does not come within the terms
of the statute ; but this act goes far to prove, that whenever the reason of the law
ceases, the law ceases also.　The Legislature seeing, perhaps, that there existed no
political reason here to prevent aliens resident from holding land, have thought it the
best way to do away all doubts.

The reason in England forbidding foreigners to hold land, was a rule founded on
the jealousy the King had against being over-run by strangers ; but in this State, the
policy is to invite them, by every mode likely to be effective.　This point being for
the complainant, I will consider the next point, which is : shall the widow be en-
dowed of one half the personality before the debts are paid, or shall she only have the
half of the personal assets remaining after the debts are paid ?　This point is ruled
for the defendant by the 4th section of the act, directing the probate of wills, &c.,
passed January, 1815 ; it is declared, that all debts owing by any person, at the time
of his decease, shall be paid by his or her executor or administrator, reserving first to
widows, in all cases under this act, their right of dower.　The 9th section of the
same act says : the remaining part of any land, slaves, and personal estate, after the
widow's right of dower, as hereinbefore provided, and after the payment of all just
debts, shall descend and be divided, &c.　If this law had been in force at the time of
Stokes' death, the complainant would prevail,—but, about two years after, the Leg-
islature again took up the subject, and occupied the same identical ground with a
new and contrary enactment.　See the act of 25th January, 1817, entitled, an act
supplementary to, and amendatory of the several acts, directing the probate of wills,
&c.; the first section of which, provides that the estate of persons dying intestate,
shall descend and be distributed in the manner following, to wit: If there shall be a
widow and child or children, the dower of such widow shall be one-third part of

said estate, after all just debts are paid, and in the same section, in speaking of a widow where there is no children, the same language is used: after the debts are paid, the widow shall be endowed. This view of the subject satisfies me that the debts must first be paid. I am also clear, that the personality is, or was, at that time (36) the primary fund for the payment of debts, and that the real estate cannot, in a case like this, be charged to raise a fund to the use of the widow. The decree is reversed, and remanded for further proceeding.